IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs May 22, 2004

## STATE OF TENNESSEE, DEPARTMENT OF CHILDREN'S SERVICES v. K.L.K.

### Appeal from the Juvenile Court for Hamilton County
No. 181,005     Suzanne Bailey, Judge

### No. E2003-2452-COA-R3-PT Filed July 6, 2004

This appeal by K.L.K. ("Mother") challenges the Juvenile Court's conclusion that there was clear and convincing evidence to terminate Mother's parental rights on three statutory grounds, and further challenges that there was clear and convincing evidence that termination of Mother's parental rights was in her daughter's best interest. We conclude there was no clear and convincing evidence to terminate Mother's parental rights on two of the three grounds relied upon by the Juvenile Court, but that there was clear and convincing evidence to support the third ground. However, we also conclude there was no clear and convincing evidence that termination of Mother's parental rights was in the best interest of the child. The judgment of the Juvenile Court is, therefore, reversed.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Reversed; Case Remanded

D. MICHAEL SWINEY, J., delivered the opinion of the court, in which HERSCHEL P. FRANKS, P.J., and CHARLES D. SUSANO, JR., J., joined.

Cara C. Welsh, Chattanooga, Tennessee, for the Appellant K.L.K.

Paul G. Summers, Attorney General and Reporter, and Douglas Earl Dimond, Assistant Attorney General, Nashville, Tennessee, for the Appellee State of Tennessee, Department of Children's Services.

# OPINION

## Background

This litigation began on October 26, 2000, when the State of Tennessee, Department of Children's Services ("DCS") filed a Petition for Temporary Custody of L.L.M. ("the child"), Mother's then eight year old daughter. The child had been living with Mother for the past two years even though the child's paternal grandmother had legal custody. In the petition, DCS alleged that the child was the victim of physical abuse and possible neglect by Mother. According to DCS, the child had bruises on her legs and upper thighs, as well as a mark under an eye. DCS sought immediate temporary custody because it believed the child was subject to immediate harm if she remained with Mother. Temporary custody was granted to DCS and a preliminary hearing was set for October 31, 2000. Mother retained counsel who had the hearing continued until November 2, at which time Mother waived her right to a preliminary hearing. The Referee determined that custody of the child should remain with DCS.

A Permanency Plan ("the Plan") was developed on November 20, 2000, with the stated goal of eventually returning custody of the child to Mother. The Plan required Mother to obtain a parenting assessment and, if necessary, attend parenting classes. Mother also was required to undergo a psychological assessment as well as a drug and alcohol assessment. The Plan noted that Mother would be required to demonstrate the ability to use constructive discipline with appropriate boundaries with such discipline not rising to the level of physical or emotional abuse. Mother was prohibited from using illegal drugs or alcohol and misusing prescription medication. Mother was instructed to pay child support as required by the State. Mother signed the Plan as well as a four page document setting forth when parental rights can be terminated involuntarily under applicable law. The Plan was approved by the Referee in December of 2000.

A status report was filed with the Juvenile Court in April of 2001 which showed that Mother was making a good faith effort to comply with the requirements of the Plan. For example, she had completed parenting and anger management classes. Mother underwent a drug and alcohol assessment and a drug test which was negative. Mother was attending counseling. She also was attending scheduled visitation with her daughter and was informing DCS when she would be unable to attend.

In May of 2001, a case assessment was undertaken to determine if unsupervised visitation was appropriate. The conclusions in this report were somewhat inconsistent with the April status report and indicated that Mother had not completed the parenting assessment or psychological assessment called for in the Plan. While Mother was going to counseling, there were no reports in the record which indicated the focus of the counseling and Mother's degree of success. It also was noted that the DCS case manager had failed to engage the child in counseling. DCS also had been requested to seek flex funds to assist Mother in paying for the parenting assessment, but the record did not show whether this had been initiated by DCS. Because of these deficiencies, the DCS Team Coordinator was unable to recommend unsupervised visitation. A further problem arose in June of

2001 when Mother and the child's paternal grandmother took the child out of Tennessee on two of the weekend visits. When DCS discovered the child had been taken out of the state, weekend visitation was stopped.

DCS eventually was able to obtain the funding for Mother to undergo a parenting and psychological assessment. The evening prior to the scheduled appointment, Mother called and cancelled. Mother failed to inform DCS that she had cancelled the appointment and failed to seek rescheduling. At this point in time, it was noted that Mother was beginning to show signs of being noncompliant with the requirements of the Plan.

A parenting and personality assessment eventually was undertaken in July of 2001. The examiner concluded that unless "the Court has evidence to the contrary, the results of this evaluation indicate no reason that [the child] should not be returned to the mother's custody" so long as she complies with any DCS requirements. The examiner recommended a transition plan which included Mother working with a child specialist to assist Mother in learning behavior modification techniques. The examiner also recommended joint counseling with Mother and the child, as well as a graduated visitation schedule, beginning with 1 to 2 days per week, then progressing to 3 days, etc.

In August of 2001, Mother's attorney was allowed to withdraw from representation. By September of 2001, Mother apparently was back on track as to completing the requirements of the Plan. An interim status report filed with the Juvenile Court indicates Mother completed the parenting classes, the anger management classes, the drug and alcohol assessment, and the parenting or psychological assessment. Mother was attending scheduled visitation with the child and informed DCS on those occasions when she was unable to attend. Mother was employed and was living in an apartment. Although Mother was not attending counseling due to a lack of funds, she nevertheless was showing improvement in her parenting skills.

In December of 2001, the DCS case manager recommended increased and unsupervised visitation between Mother and her daughter. At that time Mother was employed and maintaining a residence. The DCS case manager noted that Mother had "completed the tenets of her previous plan, and is cooperating with DCS to get her child returned." A second Permanency Plan was developed at that same time. The second Plan likewise had the stated goal of returning custody of the child to Mother. This Plan required Mother to be present for all scheduled visits and to be prepared for these visits. Mother also was required to continue with counseling to help address issues of trust and any problems that may arise during the reunification process. It also was noted that in-home services would be provided upon reunification. This Plan did not state that Mother was required to pay child support, but it did indicate that issues surrounding the entry of a child support order had been postponed until January of 2002.

A hearing was held in December of 2001 to review the status of the need for foster care and Mother's progress. Subsequently, the Referee entered an order approving DCS's stated intent of reuniting Mother and child. According to the Referee, this was appropriate and "in the

child's best interest in that the mother has substantially complied with her permanency plan and is currently participating in counseling with [the child] and progress has been reported."

An interim status report from April of 2002 indicated that Mother had changed jobs twice since the last court review. Mother also was having difficulty attending the counseling sessions. It was noted that while Mother needed to achieve more stability and demonstrate an ability to take care of all the responsibilities of being a parent, the reunification process would continue. That same month, an order of support was entered by the Juvenile Court. Specifically, Mother was ordered to pay $83 per week in child support payments. A judgment for retroactive child support also was entered against Mother in the amount of $3,403. Mother was ordered to pay $41 per week toward the arrearage.

To summarize the facts up to this point, by April of 2002, Mother had completed the requirements of the initial Plan and was moving forward with the requirements of the second Plan and the reunification process. Mother's visitation had been increased, and she was enjoying weekly unsupervised visits for as long as four days at a time. Mother's progress was acknowledged by DCS as well as the Referee.

What happened next was in dispute at trial. Mother's daughter was staying with her four days per week and Mother was supposed to take her daughter to the foster parents on Sunday evening. Mother testified that while exercising visitation in early June, she became "awful sick" and was unable to return her daughter to the foster parents. Mother stated that she called and left messages with the DCS case manager and the foster parents to explain the situation and inform them that she would take her daughter to the day camp program the following morning. Mother claims that the next morning, DCS informed her that if she did not return her daughter immediately she would be arrested. According to Mother, the next time she spoke with the DCS case worker, the DCS case worker was "very rude" and told Mother she was going to stop her visitation with the child. Mother claims the DCS case worker said she "was done trying" to help Mother, that DCS was going to terminate her parental rights, and the case "was over." Mother stated she felt like she just "couldn't win." Mother was devastated because she had "worked so hard" and her daughter "was almost home."

Mother testified that after the above conversation with the DCS case worker, she went "off the deep end" and began drinking and using drugs. This set-back was significant, eventually culminating in Mother's arrest in August for switching tags on a car, having no proof of insurance, and allowing someone to drive her car while under the influence. Mother was incarcerated for 22 days. Mother eventually entered a treatment facility in early October. While in the treatment program, Mother wrote her daughter a letter. In this letter, she stated that she wanted to do better, but had been unable to quit drinking and using drugs. Mother also went on to explain in the letter that she had entered a treatment program to teach her not to drink and use drugs, which would make her a better "momma" and a better "person." Mother expressed her continuing love to her daughter and her desire to be a good mother. This letter was mailed to the DCS case worker to be forwarded to the child. However, the DCS case manager never gave the letter to the child.

-4-

On January 28, 2003, DCS filed a Petition to Terminate Parental Rights. DCS alleged, among other things, that: 1) the child had been removed from the home for at least six months and the conditions which led to her removal persisted; 2) there was little likelihood that these conditions would be remedied at an early date which would permit a safe return of the child to the Mother; 3) Mother was unable to provide a suitable home for the child and has made no reasonable efforts to provide a suitable home; and 4) continuation of the parent/child relationship would greatly diminish the child's chances of early integration into a safe, stable and permanent home. DCS also alleged there had not been substantial compliance by Mother with the Plan, and that Mother had willfully abandoned the child by failing to visit or engaging in token visitation with the child for more than four consecutive months preceding the filing of the petition. Finally, DCS alleged it would be in the best interests of the child for Mother's parental rights to be terminated. At the time the petition was filed, DCS did not know the whereabouts of Mother. On February 28, 2003, Mother was appointed counsel after signing an Affidavit of Indigency which indicated she was unemployed at that time.

The trial was on July 18, 2003.[1] The first witness was Jennifer Collins ("Collins"), who is employed in the child support division of the Hamilton County Juvenile Court Clerk's Office. Collins testified that a child support order was entered on April 10, 2002, requiring Mother to pay child support of $83 per week and an additional $41 per week on arrearages. Since the order was signed, Mother had not paid any child support. The records reflect that Mother was not present at this earlier hearing, although she had been served with documents informing her that a hearing was going to be held regarding child support payments.

The next witness was Mother, who by then was living in Trenton, Georgia. Mother had lived there for approximately five months. Mother acknowledged that she has had several residences over the past couple of years. Mother currently lives with her former husband, Andy Crisp ("Mr. Crisp"). Mother and Mr. Crisp "got back together" right before Mother was admitted to the treatment center. Mr. Crisp drove Mother to that facility located in North Carolina.

Mother testified that despite the significant set-back she experienced beginning in June of 2002, she was currently in a position to be able to provide for her daughter. Mother and Mr. Crisp were both employed. Mother and Mr. Crisp live in a two story house, with three bedrooms, two full baths, a living room, dining room, and a swimming pond with a gazebo. There is a bedroom ready for her daughter. Mother stated that while in the treatment center, she had to learn a new lifestyle. She attends Narcotics Anonymous meetings twice a week and reads from her Alcoholics Anonymous book everyday. Mother testified that she also has a job, tends to the house, and goes to church. Mother denied taking any drugs from the time DCS initially took custody of her daughter up until the time when everything "fell apart" in June of 2002. By the time of trial, Mother had been

---

[1] We will limit our discussion of trial testimony to the extent it supplements or explains facts already discussed or provides additional information. We will not discuss trial testimony to the extent such testimony simply restates the chronology of events already set forth in the Opinion.

clean and sober for approximately nine months. When asked by the State's attorney if Mother believed her daughter should be returned home, the following discussion took place:

> A.    I sure am. I am. I am telling you that right now that she should come home. She should have already been home, sir. … I have completed two of your permanency plans.

> Q.    All right. You are telling the Court that you are in a complete and full position to be a full-time parent to your child?

> A.    Full-time. Take her to school, pick her up, everything. Buy her school clothes, feed her, everything.

> Q.    And some little stress is not going to send you back over the edge to drugs and alcohol? …

> A.    No, not if I don't let it.

Mother admitted she has paid absolutely no child support since the child came into custody of DCS. When asked why she did not pay any child support, Mother responded, "I don't know." Mother was employed at various different jobs while her daughter was in DCS custody. Although Mother did not make much money at these various jobs, she admitted she could have paid at least something. According to Mother, she did receive a copy of the notice of the child support hearing, but she was unable to attend the hearing and did not receive the actual order requiring her to pay child support. Mother later testified that had she received the order, she would have paid child support. When the order was entered in April of 2002, Mother was supposed to have custody of her daughter returned to her in the very near future and she would have wanted to do "the right thing."

Mother hired an attorney when her daughter was taken into state custody. However, Mother could not afford to pay the attorney, who subsequently withdrew from representation after only a few months. Mother recalls the Referee permitting her attorney to withdraw from representation. Mother testified she never was asked by the Referee, the Juvenile Court Judge, or anyone else whether she still needed representation or was going to try to obtain another attorney. Mother testified as follows with regard to a conversation between her and the State's attorney following the December 2001 hearing:

> Q.    Do you remember the conversation we had outside the courtroom for about twenty minutes after that [hearing]?

> A.    You can refresh my memory but, no, I do not.

> Q.    Do you remember my asking the Judge to appoint you counsel during that hearing?

A.      No, I do not.

Q.      Do you remember the Judge stating, even though it's not in
        the order, that because you were about to get your child back,
        you didn't think it was necessary at that time?

A       Yes, and I believed him.

Mother has not visited with her daughter since June of 2002 when she claims DCS stopped allowing her any visitation. Mother was not represented by an attorney when all visitation with her daughter allegedly was stopped in June of 2002.

The next witness was Lisa Newcombe ("Newcombe"), the DCS case worker assigned to this case. Newcombe took over responsibility for this case in April of 2002. Newcombe testified that when she took over this case, Mother was doing well. Mother had extended visits, picked up her daughter every day after school, and even went on a field trip with her daughter. Mother had completed all the classes and various assessments called for in the Plans. The drug and alcohol assessment completed in 2001 indicated that no treatment was needed.

With regard to the incident where Mother did not return the child to the foster parents on Sunday evening, Newcombe testified that she received a call the following Monday from the foster parents saying the child had not been returned. When Newcombe was unable to get in touch with Mother, she called the Court to ascertain what to do. Newcombe was able to contact Mother around 9:30 a.m., and told her to immediately take the child to day care and then come to her (i.e. Newcombe's) office. Mother took the child to the day care, but did not go to Newcombe's office. Newcombe testified that she tried for several days to contact Mother and, when she was unsuccessful, she sent Mother a certified letter to her last known address. According to Newcombe, Mother called her a couple of days later and inquired "when she was going to see [her daughter] again and I told her that the next visit had to be supervised so we could discuss what happened." Mother admitted to Newcombe that she had taken her daughter to Georgia again. Newcombe testified that she once again asked Mother to come to the DCS office to discuss the situation. Mother claimed she did not have a car or anyone to take her. Newcombe did not hear from Mother again until February of 2003, at which time Mother stated she wanted to visit her daughter. Newcombe informed her that a petition to terminate her parental rights had been filed and visitation was no longer allowed. Newcombe is not aware of Crisp's background, and the house/home environment where Mother and Crisp are now living has not been investigated. Newcombe testified that the child needs stability and permanency, and she did not see that happening with Mother.

On cross-examination, Newcombe testified that it had been her intent to divest DCS of custody of the child at a hearing that was scheduled in July 25, 2002. Approximately May 3, 2002, the child's foster parent became angry about the reunification process because the foster parent did not believe it was the appropriate time for the child to be returned to Mother. The foster parent refused to continue being a foster parent to the child, thus requiring DCS to secure new foster

parents. A second problem arose in mid-May of 2002 when, apparently due to Mother's inattention, the child turned in a school project late. DCS had discussed the project with Mother and went over what needed to be done so the project would be completed in a timely manner. According to Newcombe's notes, "this lack of effort was not going to be a good indication of [Mother's] ability to help [the child] with her work in the future. [Mother] was told that this was her last chance and if she did not do everything she was supposed to do in the time between now and court, the situation would turn toward termination." Three days later the school project was turned in, albeit late. The child's teacher then asked Mother to help transport some of the school children to a skating party the following Thursday, and Mother agreed to do so.

The incident where Mother returned the child a day late occurred on June 3, 2002. The DCS case notes discussing what happened on June 3rd confirm that Mother did call the foster parents and left a message informing them that she would take the child to day camp the following day. Mother did tell Newcombe that the reason she did not return the child on time was because she was sick. According to the DCS case notes, Newcombe then told Mother that her visits were "suspended."[2] Thereafter, Mother also informed Newcombe that she was in the process of moving to Georgia. Newcombe informed Mother that the new home would have to be investigated before the child could be taken there. The DCS notes also state the following: "Steve Jones called regarding [the child] and [Mother] not bringing [the child] back to the foster home on time. Mr. Jones stated that termination would be considered seriously after this matter." Newcombe acknowledged at trial that, prior to the June 3rd incident, there had been "no major problems" with Mother returning her child to the foster parents on time. On June 13th, Newcombe spoke to the child's counselor who informed Newcombe that termination of Mother's parental rights would harm the child "in a large way." When Mother subsequently ceased contact with DCS, the counselor indicated at that time that it was best to move forward with the termination process.

On September 4, 2003, the Juvenile Court entered an Order terminating Mother's parental rights. The Juvenile Court found:

1.      The child has been in DCS custody for at least six months; DCS has made reasonable efforts to assist Mother in establishing a suitable home; that Mother has not made a reasonable effort to do so; and that Mother has demonstrated a lack of concern to such a degree that it appeared unlikely she would be able to provide a suitable home at an early date. The Juvenile Court did note that prior to June of 2002, Mother had made a reasonable effort, but ceased all efforts after that date;

_____

[2] Although contrary to the case notes, Newcombe testified that Mother's visitation had not been suspended, but rather her visits were to be supervised. Newcombe testified that Mother's visitation was not actually "suspended" until July after Mother had ceased contact with DCS and the child.

2. There was little likelihood that the conditions preventing return of the child to Mother would be remedied at an early date;

3. Continuation of the parent/child relationship greatly diminishes the child's chances of early integration into a stable and suitable home;

4. Mother failed to comply in a substantial manner with the responsibilities of the foster care Plan by ceasing contact with DCS since June of 2002, and Mother has failed to maintain suitable housing for herself and the child;

5. Mother willfully abandoned the child for more than four consecutive months preceding the filing of the petition;

6. Mother failed to make any adjustment of circumstances to make it safe and in the child's best interests to be returned to her care; and

7. It was in the best interest of the child for Mother's parental rights to be terminated.

Mother appeals claiming there was no clear and convincing evidence to terminate her parental rights. Mother also claims there was no clear and convincing evidence to support a finding that termination of Mother's parental rights was in the best interest of the child. Finally, Mother claims she was denied adequate counsel pursuant to Tenn. R. Juv. P. 39 and Rule 13 of the Tennessee Supreme Court.

**Discussion**

The factual findings of the Trial Court are accorded a presumption of correctness, and we will not overturn those factual findings unless the evidence preponderates against them. *See* Tenn. R. App. P. 13(d); *Bogan v. Bogan*, 60 S.W.3d 721, 727 (Tenn. 2001). With respect to legal issues, our review is conducted "under a pure *de novo* standard of review, according no deference to the conclusions of law made by the lower courts." *Southern Constructors, Inc. v. Loudon County Bd. Of Educ.*, 58 S.W.3d 706, 710 (Tenn. 2001). As discussed by this Court in *In re Adoption of T.A.M.*, No. M2003-02247-COA-R3-CV, 2004 Tenn. App. LEXIS 317 (Tenn. Ct. App. May 12, 2004):

Because of the heightened burden of proof required by Tenn. Code Ann. § 36-1-113(c), we must adapt Tenn. R. App. P. 13(d)'s customary standard of review for cases of this sort. First, we must

review the trial court's specific findings of fact de novo in accordance with Tenn. R. App. P. 13(d). Thus, each of the trial court's specific factual findings will be presumed to be correct unless the evidence preponderates otherwise. Second, we must determine whether the facts, either as found by the trial court or as supported by the preponderance of the evidence, clearly and convincingly establish the grounds for terminating the biological parent's parental rights. *Jones v. Garrett*, 92 S.W.3d at 838; *In re Valentine*, 79 S.W.3d at 546; *Ray v. Ray*, 83 S.W.3d at 733; *In re L.S.W.*, 2001 Tenn. App. LEXIS 659, No. M2000-01935-COA-R3-JV, 2001 WL 1013079, at *5 (Tenn. Ct. App. Sept. 6, 2001), *perm. app. denied* (Tenn. Dec. 27, 2001).

*In re Adoption of T.A.M.,* 2004 Tenn. App. LEXIS 317, at ** 8-9 (footnote omitted).[3]

In *Dep't of Children's Servs. v. D.G.S.L.*, this Court discussed the relevant burden of proof in cases involving termination of parental rights. Specifically, we observed:

It is well established that "parents have a fundamental right to the care, custody, and control of their children." *In re Drinnon*, 776 S.W.2d 96, 97 (Tenn. Ct. App. 1988) (citing *Stanley v. Illinois*, 405 U.S. 645, 92 S. Ct. 1208, 31 L. Ed. 2d 551 (1972)). "However, this right is not absolute and parental rights may be terminated if there is clear and convincing evidence justifying such termination under the applicable statute." *Id.* (citing *Santosky v. Kramer*, 455 U.S. 745, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982)).

Termination of parental or guardianship rights must be based upon a finding by the court that: (1) the grounds for termination of parental or guardianship rights have been established by clear and convincing evidence; and (2) termination of the parent's or guardian's rights is in the best interests of the child. Tenn. Code Ann. § 36-1-113(c). Before a parent's rights can be terminated, it must be shown that the parent is unfit or substantial harm to the child will result if parental rights are not terminated. *In re Swanson*, 2 S.W.3d 180, 188 (Tenn. 1999); *In re M.W.A., Jr.*, 980 S.W.2d 620, 622 (Tenn. Ct. App. 1998). Similarly, before the court may inquire as to whether termination of parental rights is in the best interests of the child, the court must first determine that the grounds for termination have been established by clear and convincing evidence. Tenn. Code Ann. § 36-1-113(c). This Court discussed the "clear and convincing

---

[3] When this Opinion was released, the time in which to file a Rule 11 application for permission to appeal to the Tennessee Supreme Court in *In re Adoption of T.A.M.* had not yet expired.

evidence" standard in *O'Daniel v. Messier*, 905 S.W.2d 182 (Tenn. Ct. App. 1995), as follows:

> The "clear and convincing evidence" standard defies precise definition. *Majors v. Smith*, 776 S.W.2d 538, 540 (Tenn. Ct. App. 1989). While it is more exacting than the preponderance of the evidence standard, *Santosky v. Kramer*, 455 U.S. at 766, 102 S. Ct. at 1401; *Rentenbach Eng'g Co. v. General Realty Ltd.*, 707 S.W.2d 524, 527 (Tenn. Ct. App. 1985), it does not require such certainty as the beyond a reasonable doubt standard. *Brandon v. Wright*, 838 S.W.2d 532, 536 (Tenn. Ct. App. 1992); *State v. Groves*, 735 S.W.2d 843, 846 (Tenn. Crim. App. 1987).
>
> Clear and convincing evidence eliminates any serious or substantial doubt concerning the correctness of the conclusions to be drawn from the evidence. *See Hodges v. S. C. Toof & Co.*, 833 S.W.2d 896, 901 n. 3 (Tenn. 1992). It should produce in the fact-finder's mind a firm belief or conviction with regard to the truth of the allegations sought to be established. *In re Estate of Armstrong*, 859 S.W.2d 323, 328 (Tenn. Ct. App. 1993); *Brandon v. Wright*, 838 S.W.2d at 536; *Wiltcher v. Bradley*, 708 S.W.2d 407, 411 (Tenn. Ct. App. 1985)...

*Dep't of Children's Servs. v. D.G.S.L.*, No. E2001-00742-COA-R3-JV, 2001 Tenn. App. LEXIS 941, at **16-18 (Tenn. Ct. App. Dec. 28, 2001), *no appl. perm. appeal filed.*

Termination of parental rights may be based upon a number of statutory grounds. As relevant to this appeal, the statutory provisions provide that parental rights can be terminated for the following reasons:

> (1) Abandonment by the parent or guardian, as defined in § 36-1-102, has occurred;
>
> (2) There has been substantial noncompliance by the parent or guardian with the statement of responsibilities in a permanency plan or a plan of care pursuant to the provisions of title 37, chapter 2, part 4;

(3)(A) The child has been removed from the home of the parent or guardian by order of a court for a period of six (6) months and:

(i) The conditions which led to the child's removal or other conditions which in all reasonable probability would cause the child to be subjected to further abuse or neglect and which, therefore, prevent the child's safe return to the care of the parent(s) or guardian(s), still persist;

(ii) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent(s) or guardian(s) in the near future; and

(iii) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home.

Tenn. Code Ann. §§ 36-1-113(g)(1) through (g)(3) (Supp. 2003). Tenn. Code Ann. § 36-1-102 (1)(A)(i) defines "abandonment" as follows:

For a period of four (4) consecutive months immediately preceding the filing of a proceeding or pleading to terminate the parental rights of the parent(s) or guardian(s) of the child who is the subject of the petition for termination of parental rights or adoption, that the parent(s) or guardian(s) either have willfully failed to visit or have willfully failed to support or have willfully failed to make reasonable payments toward the support of the child….

In the present case, the Juvenile Court found there was clear and convincing evidence that the statutory grounds for termination in Tenn. Code Ann. §§ 36-1-113(g)(1) through (g)(3) had been met. Clear and convincing evidence supporting any single ground will support a termination order. *See In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002).

Although the Juvenile Court did not state in its final judgment the exact reason it found Mother had abandoned the child, based on comments made by the Juvenile Court in announcing its decision after closing argument was completed, it appears that the Juvenile Court based this determination on Mother's failure to pay any child support. In the State's brief on appeal, its argument is limited to whether Mother willfully failed to support her daughter for the relevant four month period. Accordingly, we conclude that the Juvenile Court determined Mother had abandoned the child by willfully failing to support her.

The facts are undisputed that the child support order was entered in April of 2002 and Mother has paid no child support since that time. Mother claims she did not receive a copy of the

order, although she did receive a copy of the notice setting the matter for hearing. Thus, at the very least, Mother knew a hearing regarding the entry of a child support order was imminent. Even if Mother did not receive the actual order, we believe she was responsible for ascertaining whether and when such an order was entered.

The petition to terminate Mother's parental rights was filed on January 28, 2003. Thus, as correctly pointed out by the State in its brief, the relevant statutory time period for ascertaining whether Mother abandoned her daughter is from September 28, 2002, through January 27, 2003. It is important to note that in making this analysis, "only a parent's conduct in the four months immediately preceding the filing of a petition then before the court may be used as grounds to terminate parental rights" under this statutory section. *See In re D.L.B.*, 118 S.W.3d 360, 366 (Tenn. 2003). Approximately two weeks into the relevant four month period, Mother entered a treatment facility located in North Carolina. Although the record is unclear how long Mother remained at the treatment facility, based on the testimony of the child's maternal grandmother, Mother was at this facility for almost three months. At trial, the State introduced no proof that Mother was working or was able to work during the time she was at the treatment facility.

Our Tennessee Supreme Court had held that an "element of intent must also be applied to the definition of abandonment…." *In re D.L.B.*, 118 S.W.3d 360, 367 (Tenn. 2003)(citing *In re Swanson*, 2 S.W.3d 180, 188 (Tenn. 1999)). Relying on the intent requirement, this Court held that abandonment was not the proper basis to terminate parental rights when the parent was incarcerated during the four month relevant period. Specifically, in *In re T.L.P.*, No. W1999-01940-COA-R3-CV, 2001 Tenn. App. LEXIS 638 (Tenn. Ct. App. Aug. 22, 2001), *appl. perm. appeal denied Jan. 14, 2002*, we stated as follows:

> The petition for termination of parental rights was filed on August 26, 1998. Ms. Henderson was incarcerated from June 2, 1997 until May 19, 1999. Because Ms. Henderson was incarcerated during the four months immediately preceding the filing of the petition, we find the element of intent lacking in Ms. Henderson's failure to visit and/or support the children. Absent intent, we cannot uphold the termination of Ms. Henderson's parental rights on the ground of abandonment under the standard articulated by the *Swanson* court. Accordingly, we find that the trial court erred by terminating Ms. Henderson's parental rights on the ground of abandonment.

*In re T.L.P.*, 2001 Tenn. App. LEXIS 638, at **12, 13.

In the present case, there is no proof at all that Mother actually was working or capable of working while she was in the treatment facility, and there is no proof that she otherwise had the resources with which to pay the ordered child support. We acknowledge that Mother was in the treatment facility as a result of her own voluntary drug and alcohol use. At the same time, however, public policy certainly is to encourage parents with drug and/or alcohol problems to seek

necessary treatment or otherwise take action to address that situation. We do not intend to imply that a parent's child support obligation is automatically suspended simply because he or she enters a treatment program to address a drug or alcohol problem. However, absent proof that the parent either was working, was capable of working, or otherwise had resources to pay child support while in the treatment program, we do not believe the necessary intent not to pay child support is present. Since this proof was lacking altogether in this case, we conclude that the Juvenile Court erred when it concluded the evidence was clear and convincing that Mother had abandoned the child because she willfully failed to pay child support for the four month period immediately preceding the filing of the petition.

In its final judgment, the Juvenile Court indicated that termination of Mother's parental rights also was proper on two other grounds, those being the grounds set forth in Tenn. Code Ann. § 36-1-113(g)(2) and (g)(3), *supra*. There appears to be some disagreement between the parties as to which of these two grounds actually was relied upon by the Juvenile Court when discussing its findings of fact. Mother claims the Juvenile Court held that her parental rights should be terminated for substantial noncompliance with the Plan pursuant to § 36-1-113(g)(2). On the other hand, the State argues that the Juvenile Court concluded termination of Mother's parental rights was proper pursuant to § 36-1-113(g)(3). When discussing its factual findings, the Juvenile Court paid particular attention to what it determined was Mother's current inability to take care of her daughter. The Juvenile Court also noted that while Mother had at one time substantially complied with the terms of the Plans, that all fell apart after June of 2002.

The record shows it is true that prior to June of 2002, Mother had substantially complied with the Plans. Although the facts are somewhat in dispute regarding exactly what happened and what was said after the June 3rd incident when Mother was late returning the child to the foster parents, the proof is nonetheless clear that Mother encountered a significant setback. When ascertaining whether there was clear and convincing evidence to terminate Mother's parental right for either or both of the grounds contained in §§ 36-1-113(g)(2) and (g)(3), we are not limited to the four month period immediately preceding the filing of the petition, as is the case with abandonment. By the time of trial, Mother had been clean and sober for nine months. She had established a residence and was working. Unfortunately, as a home study had not been undertaken, we do not know whether Mother's residence was suitable for the child. The record also reveals very little about Crisp and nothing about whether his presence in the home would affect its suitability for the better or for the worse.

After reviewing the record as a whole, we believe there is clear and convincing evidence that certain "other conditions" existed at the time of trial which prevented the Juvenile Court from being able to conclude that Mother was in a position at that time to fully and competently care for the child, and that there was a post-June 2002 failure to substantially comply with the requirements of the second Plan as a whole. Our concern surrounds the Juvenile Court's apparent conclusion that there was little likelihood that Mother had remedied or could remedy these conditions in the near future, which is a requirement to terminate parental rights pursuant to § 36-1-113(g)(3). If Mother's situation had been frozen in time and her overall situation at the time of trial

was the same as it had been when the petition was filed, we would be more inclined to agree with the Juvenile Court's conclusion. However, this would require that we completely subjugate the substantial progress Mother made prior to June 2002 and the progress she made after entering treatment a few months later on October 8th to the negative impact of what happened during her set-back. This we are not prepared to do. Therefore, while we affirm the Juvenile Court's conclusion that grounds existed pursuant to § 36-1-113(g)(2) for failure to substantially comply with the Plan, we reverse the Juvenile Court's determination that grounds existed pursuant to § 36-1-113(g)(3).

Having affirmed the Juvenile Court's conclusion that grounds existed pursuant to § 36-1-113(g)(2), we now turn to whether termination of Mother's parental rights was in the best interest of the child. Tenn. Code Ann. § 36-1-113(i) describes the standard for determining whether termination is in the best interests of the child in such cases:

(i) In determining whether termination of parental or guardianship rights is in the best interest of the child pursuant to this part, the court shall consider, but is not limited to, the following:

(1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;

(2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

(3) Whether the parent or guardian has maintained regular visitation or other contact with the child;

(4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

-15-

(7)   Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol or controlled substances as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8)   Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9)   Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

Tenn. Code Ann. § 36-1-113(i) (Supp. 2003).

Since the best interest determination requires a separate analysis, the existence of grounds to terminate parental rights does not automatically mean that termination of parental rights is in the best interest of the child. *See e.g.*, *In re D.I.S.*, No. W2000-00061-COA-R3-CV, 2001 Tenn. App. LEXIS 358 (Tenn. Ct. App. May 17, 2001), *no appl. perm. appeal filed*, (affirming trial court's conclusion that, while there was clear and convincing evidence of grounds to terminate parental rights, there was no clear and convincing evidence that such termination was in the best interest of the child). In the present case, the Juvenile Court concluded that Mother had not made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be returned to her and that she was unable to effect a lasting adjustment after reasonable efforts by available social services agencies.

In many of the cases when DCS has been awarded temporary custody of a child, DCS is able to work with the parents and, over time, custody of the child is returned to the parents when it is safe to do so. These situations, of course, never reach this Court. For those cases that do reach this Court, it is difficult to imagine a case which has more at stake than that of parents who have forever lost their rights to their child. Because of the very nature of these proceedings, as discussed previously, there is a heightened burden of proof on the State as well as federal and state constitution protections.

The specific question as to this issue that had to be answered by the Juvenile Court and by this Court on appeal is whether the evidence contained in the record was clear and convincing that termination of Mother's parental rights to this child was in the best interest of this child at the time of trial. We have reviewed the record in its entirety and conclude there was no clear and convincing evidence that termination of Mother's parental rights was in the best interests of the child. In reaching this conclusion, we do not intend to minimize the seriousness of Mother's post-June 3rd conduct. However, prior to this set-back, Mother had made significant progress by having

essentially completed two permanency plans, and was literally on the verge of regaining custody. She was exercising unsupervised visitation for as many as four days per week and certainly had a meaningful relationship with her daughter. Beginning in October of 2002, Mother went into a treatment program and began taking steps available to her to help reduce and, hopefully, eliminate the negative consequences of her post-June 3rd behavior. By the time of trial, Mother had been clean and sober for nine months, she had established a residence with a bedroom set up and waiting for her daughter, and she was gainfully employed. This is not a case of "too little, too late," as was the situation in *D.G.S.L., supra*, wherein the mother admitted she was a drug addict and, at the time of trial, had been "clean" for only one week. 2001 Tenn. App. LEXIS 941, at *9. We are unable to conclude that, at the time of trial, it did not appear reasonably possible that Mother would be able to make a lasting adjustment of circumstances or conditions such that it would be safe and in the child's best interests to be returned to Mother's care. Considering the other pertinent factors contained in Tenn. Code Ann. § 36-1-113(i) and the facts of this case as a whole, we conclude there was no clear and convincing evidence that it was in the best interest of the child to terminate Mother's parental rights at that time.

In light of our conclusion, we pretermit Mother's argument that she was denied counsel pursuant to Tenn. R. Juv. P. 39 and Rule 13 of the Tennessee Supreme Court. The Final Judgment of the Juvenile Court is reversed. On remand, DCS is instructed to develop a new Permanency Plan consistent with Mother's and the child's current situation.

### Conclusion

The Judgment of the Juvenile Court is reversed, and this cause is remanded to the Juvenile Court for further proceedings consistent with this Opinion and for collection of the costs below. The costs on appeal are assessed against the Appellee State of Tennessee, Department of Children's Services.

_____
D. MICHAEL SWINEY, JUDGE

-17-